**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>HEALTHCARE REAL ESTATE PARTNERS, LLC,<br><br>     Debtor. | Chapter 7<br><br>Case No. 15-11931 (CTG) |
| HEALTHCARE REAL ESTATE PARTNERS, LLC,<br><br>     Plaintiff,<br><br>v.<br><br>SUMMIT HEALTHCARE REIT, INC., *et al.*,<br><br>     Defendants. | Adv. Pro. No. 16-50981 (CTG) |

## <u>MEMORANDUM OPINION</u>

The petitioning creditors filed an involuntary chapter 7 bankruptcy petition against the debtor for reasons that had nothing to do with recovering on their prepetition claims against the debtor. Instead, the petition was filed in order to invoke an *ipso facto* clause that would entitle the petitioning creditors, upon the entry of an order for relief, to terminate the debtor's role as manager of two investment funds. The bankruptcy case was ultimately dismissed, though not before the petitioning creditors succeeded in removing the debtor as the manager of the funds.

The debtor now moves for damages under § 303(i) of the Bankruptcy Code. As a statutory matter, attorneys' fees and costs may be awarded whenever an

involuntary case is dismissed.  The Court is satisfied that an award of reasonable fees and costs is appropriate under the circumstances of this case.

But how much?  Based on its review of the submitted invoices, the Court concludes that $172,107.37 in fees and costs were incurred in connection with seeking dismissal of the bankruptcy case and the motion to recover fees under § 303(i)(1).  The only reason most of those fees were incurred, however, was because the debtor's general counsel negligently failed to pay attention to the involuntary petition when it was validly served.  Indeed, the general counsel testified that he thought the petition was just another unpaid bill in a stack of papers on his desk that could wait until he was able to focus on it.

Had the debtor promptly retained counsel and responded to the petition, there can be little dispute that the case would have been promptly dismissed.  The debtor agrees that the fees and costs, in that event, would not have exceeded $50,000.  The Court further concludes that a reasonable award for the fees and costs associated with bringing the motion under § 303(i) (which is itself recoverable under § 303(i)) would not exceed $25,000.  The debtor is accordingly entitled to recover $75,000 in reasonable fees and costs.  The incremental fees incurred in excess of $75,000 are more attributable to the debtor's failure to respond than to the filing of the petition and therefore cannot be recovered under § 303(i)(1).

The debtor also seeks to recover damages under § 303(i)(2) for the lost profits it claims it would have earned but for the filing of the involuntary petition.  Damages under this section are available only in cases in which the filing was in bad faith.

While the cases on the bad faith use of an involuntary petition set out a multi-factor balancing test, the question of bad faith presented here is an easy one.  An involuntary bankruptcy case that is filed for any reason other than the creditors' desire to maximize creditors' recovery against the debtor's estate cannot be in good faith.  This case was filed for the purpose of permitting the petitioning creditors and Summit Healthcare to invoke an *ipso facto* clause and thereby terminate the debtor's right to manage the funds.[1]  That is not an appropriate use of the bankruptcy process.  The debtor is therefore entitled to recover any damages that were caused by the filing.  The question under § 303(i)(2) is whether the debtor suffered compensable damages.

On that issue, the record makes clear that the debtor's business was moribund at the time of the petition.  While the debtor served as the manager of investment funds, it lacked the personnel or the expertise to perform that function.  To be sure, filing an involuntary bankruptcy petition was the wrong way to wind down this defunct business.  But that does not change the fact that the debtor's business was defunct and ought to have been wound down.  It therefore suffered no compensable damages, beyond the associated attorneys' fees and costs, as a result of the bad faith filing.

In addition, the debtor seeks to recover punitive damages under § 303(i)(2) for the bad faith filing.  This presents a close question, because while it ought to have been self-evident that filing an involuntary bankruptcy petition for the purposes of

---

[1] Summit Healthcare REIT, Inc. is referred to as "Summit Healthcare."  Summit Healthcare and the individual petitioning creditors are the defendants in the adversary proceeding, and are referred to, collectively, as the "defendants."

invoking an *ipso facto* clause was improper, neither the debtor's nor this Court's own research have identified a case that says so directly. This is now such a case. In the face of the relatively sparse guidance from the caselaw and the quite limited actual damages suffered, however, this Court does not believe it necessary or appropriate to award punitive damages here.

The debtor also contends that it is entitled to damages under § 362(k) of the Bankruptcy Code for violation of the automatic stay – specifically, the termination of the debtor's right to serve as manager of the funds based on the entry of the order for relief in the bankruptcy case. Section 362(k) by its terms is limited to claims by "an *individual* injured by [a] willful violation of [the] stay."[2] While the majority view is that the term "individual" is limited to flesh-and-blood human beings, the Third Circuit has found that the statute nevertheless applies to a corporate debtor.[3] Whether it might make sense to reconsider that precedent in light of subsequent decisions from other courts is a matter committed to the sole discretion of the Third Circuit. That court's existing precedent is controlling here and permits the debtor to assert a damages claim for alleged violations of the automatic stay.

As an initial matter, there can be no question that the debtor's right to serve as manager of the funds – a position from which the debtor could potentially have derived economic benefit – was "property of the estate" within the meaning of § 541 as of the filing of the petition. The petitioning creditors argue that they did not violate

---

[2] 11 U.S.C. § 362(k) (emphasis added).

[3] *In re Atlantic Bus. & Cmty. Corp.*, 901 F.2d 325, 328-329 (3d Cir. 1990).

the automatic stay because the entry of the order for relief by itself (rather than any action on their part) operated to terminate the debtor's management rights. If that were correct, there would be an argument that the defendants' subsequent actions to replace the debtor as manager and dissolve the funds did not implicate estate property and thus did not violate the automatic stay.

That argument turns, however, on the proposition that the *ipso facto* clause that would operate to terminate the debtor's management rights was enforceable notwithstanding § 541(c). To that end, the petitioning creditors argue that § 541(c) only operates to protect a debtor's *economic* interest in a limited liability company, not its rights to participate in governance. The caselaw on which the petitioning creditors rely for this proposition, however, is limited to the executory contract context, and involves a construction of language in § 365(e) that is absent in § 541(c). Accordingly, the *ipso facto* clause that would terminate the debtor's right to manage the funds was not enforceable. The debtor's management rights thus remained property of the estate notwithstanding the terms of the *ipso facto* clause. The subsequent actions that the petitioning creditors and Summit Healthcare took to replace the debtor as the manager of, and to dissolve, the funds therefore did violate the automatic stay.

Under § 362(k), a debtor is entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting a claim for violation of the automatic stay. Debtor has submitted invoices demonstrating those fees and costs. Based upon the Court's assessment of those invoices, the Court concludes that the debtor's

compensable damages for attorneys' fees and costs arising out of the stay violation are $517,723.76.

The debtor also contends that, had the debtor's management rights not been terminated, it would have earned profits, and that the loss of those profits are recoverable damages for the violation of the stay. The evidence to which the debtor points, however, is simply too speculative to support a damages award. In view of the evidence showing that the debtor lacked the capability to perform the basic responsibilities of a fund manager, there is no reason to believe that the debtor would have, but for the stay violation, earned profits from managing the funds.[4] Debtor's recovery for the violation of the automatic stay is thus limited to its fees and costs.

## Factual and Procedural Background

Cornerstone Ventures hired Kent Eikanas in 2012 and charged him with turning around its struggling real estate investment trust, Cornerstone Core Properties. While the common shares of Cornerstone Core Properties were publicly held, the company was closely linked to the Cornerstone family of companies. Those connections included an advisory agreement with Cornerstone Realty and a joint venture with another Cornerstone entity.[5]

---

[4] The contested matter seeking damages under § 303(i) and the adversary proceeding seeking damages for violation of the automatic stay were litigated as a single proceeding and are addressed together in this Memorandum Opinion. This Memorandum Opinion sets out the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable to the adversary proceeding under Fed. R. Bankr. P. 7052 and to the contested matter under Fed. R. Bankr. P. 9014(c).

[5] Cornerstone Ventures, Inc. is referred to as "Cornerstone Ventures." Cornerstone Realty Advisors, LLC is referred to as "Cornerstone Realty." Cornerstone Core Properties REIT, Inc. is referred to as "Cornerstone Core Properties." *See generally* Jan. 9, 2023 Hr'g Tr. at 126, 183.

Soon after Eikanas was hired, Cornerstone Core Properties changed its name to Summit Healthcare.  Eikanas' task was to reposition Summit Healthcare, which had been focused on industrial real estate, to a new focus on senior housing facilities.[6] In addition to serving as president of Summit Healthcare, Eikanas also served as an officer of Cornerstone Ventures, and the president and sole director of Cornerstone Realty, the entity that served as advisor to Summit Healthcare.[7]

Summit Healthcare was the majority holder of a holding company.  A separate Cornerstone entity was Summit Healthcare's joint venture partner and held a minority stake in the holding company.  The holding company owned several special purpose entities.[8]  Each of those special purpose entities, in turn, owned the underlying senior housing facilities.[9]

In order to raise funds from outside investors, Cornerstone and its joint venture partner created a separate holding company that owned a minority interest in the special purpose entities.[10]  Interests in this holding company were sold to those investors through two funds – a qualified fund and a retail fund.[11]  The funds' investors received private placement memoranda that included operating

---

[6] Jan. 9, 2023 Hr'g Tr. at 129-130.

[7] *Id.* at 121-122.

[8] This holding company is referred to as "Holdco 1."  *See* Jan. 9, 2023 Hr'g Tr. at 138; D.I. 191 at 4.  Citations to materials filed on the docket in this adversary proceeding are cited as "D.I. __."  Citations to materials filed on the docket in the main bankruptcy case are cited as "Main Case D.I. __."

[9] D.I. 191 at 4.

[10] This separate holding company is referred to as "Holdco 2."  Jan. 9, 2023 Hr'g Tr. at 138, 140.

[11] *Id.*

agreements and subscription agreements explaining how the funds would operate.[12] These two funds were managed by a Cornerstone subsidiary that was the debtor in this bankruptcy case, HCRE.[13]  Eikanas was the initial president and sole director of HCRE.[14]

Under the operating agreements of the two funds (the provisions of which were nearly identical), the debtor was entitled to receive a monthly management fee for fulfilling its managerial duties and a disposition fee on the sale of the underlying senior housing facilities.[15]  If the funds performed well and the investors were compensated as set forth in the operating agreements, then the debtor could receive incentive distributions from the cash flow.[16]  And finally, the debtor would be able to receive reimbursements for its operating expenses if more investors bought into the funds and other currently due operating expenses were paid.[17]

In January 2014, however, the tenant in the largest of the underlying real estate properties, a senior nursing facility located in Texas, stopped paying rent and

---

[12] Pls. Exs. 1-2.  *See also* Jan. 9, 2023 Hr'g Tr. at 141.  Exhibits introduced into evidence in connection with the January 2023 trial are cited as "Pls. Ex. __" and "Defs. Ex. __."

[13] Debtor Healthcare Real Estate Partners, LLC is referred to either as the "debtor" or as "HCRE."  *See* Jan. 9, 2023 Hr'g Tr. at 141-142; D.I. 191 at 4-5.  *See also* Amended Corporate Disclosure Statement at 1, *In re Healthcare Real Estate Partners, LLC*, No. 1:17-cv-01555-MEM (D. Del. Jan. 31, 2018), D.I. 21.

[14] Pls. Ex. 1 at 67; D.I. 202-4 at 17.

[15] Defs. Ex. 3 § 6.1.1; Defs. Ex. 4 § 6.1.1.  While the parties dispute whether the debtor agreed to defer receipt of the management fees until the investors received a particular annual return on their investment, the resolution of that dispute has been effectively overtaken by the Court's disposition of the other issues addressed herein.

[16] Defs. Ex. 3 §§ 5.1.2, 5.2.3; Defs. Ex. 4 §§ 5.1.2, 5.2.3.

[17] Defs. Ex. 3 § 6.2.1; Defs. Ex. 4 § 6.2.1.

filed for bankruptcy.[18]  The loss of these revenues was devastating to the Cornerstone enterprise and required Cornerstone Ventures to borrow funds from Summit Healthcare to meet its payroll.[19]  In view of Cornerstone's deteriorating financial condition, on March 17, 2014, Eikanas terminated Summit Healthcare's advisory agreement with Cornerstone Realty.[20]  In response, Cornerstone Ventures' then-chief executive officer, Arto Nuutinen, removed Eikanas as president of HCRE and appointed  himself to that position.[21]  After Cornerstone Ventures failed to make payroll on March 30, 2014, many of its key employees left the company and were hired by Summit Healthcare.[22]  This set of events led Cornerstone Ventures and Cornerstone Realty to sue Summit Healthcare and Eikanas (among others) in a California state court.[23]  That action was ultimately dismissed on account of the plaintiffs' failure to comply with its discovery obligations.[24]

This corporate divorce between Summit Healthcare and the Cornerstone entities left HCRE in a bind.  On the one hand, it was still the manager of the two funds, and remained obligated to perform the duties of manager of the funds.  On the

---

[18] D.I. 202-4 at 48; Jan. 9, 2023 Hr'g Tr. 204-205.

[19] Jan. 9, 2023 Hr'g Tr. at 174-175, 178; Jan. 10, 2023 Hr'g Tr. at 14; *see also* Defs. Ex. 37 at 2-3.

[20] Defs. Ex. 40.

[21] Defs. Ex. 68.  *See also* Jan. 9, 2023 Hr'g Tr. at 188.

[22] Jan. 9, 2023 Hr'g Tr. at 174-175.

[23] Defs. Ex. 48; *see also* Complaint, *Cornerstone Realty Advisors, LLC, et al. v. Summit Health Care REIT, Inc., et al.,* Case No. 30-2014-00714004-CU-BT-CJC (Cal. Super. Ct., Orange County, Apr. 1, 2014), D.I. 1.

[24] *Cornerstone Realty Advisors, LLC, et al. v. Summit Health Care REIT, Inc., et al.,* 56 Cal. App. 5th 771, 787 (2020).

other hand, HCRE never had its own employees.  Instead, all of the employees who performed services for the Cornerstone entities (including Summit Healthcare and HCRE) were formally employees of Cornerstone Ventures and worked for the related businesses under the terms of various intercompany services agreements.[25]

As a result, after Cornerstone Ventures' key employees quit their jobs and were recruited to join Summit Healthcare, HCRE found itself without access to personnel with the skills to manage the funds.  Lacking the necessary employees, HCRE effectively failed to perform its management functions over the funds, which included sending quarterly statements and tax reporting information, and, importantly, providing the investors with their cash distributions.[26]

The individual investors in the funds (many of whom were friends of Eikanas') grew increasingly frustrated, as expressed in a series of letters the investors wrote to HCRE that were admitted into evidence.[27]  The individual investors, after failing to obtain any response at all from HCRE over the course of several months, then began pressuring Summit Healthcare to find a solution to the problem.[28]  Eventually, certain of the individual investors retained counsel who wrote to Summit Healthcare, asserting potential claims.[29]

---

[25] Jan. 9, 2023 Hr'g Tr. at 124-126.

[26] Defs. Ex. 13.

[27] Defs. Ex. 5-6, 8-11.

[28] Jan. 9, 2023 Hr'g Tr at 209; Jan. 10, 2023 Hr'g Tr. at 22.

[29] *See* Defs. Ex. 61.

In the face of this pressure, Summit Healthcare crafted a plan, to which the investors signed on, that would allow the investors to replace HCRE as the manager of the funds (after which Summit Healthcare would acquire the investors' interests in, and then dissolve, the funds).[30]   Summit Healthcare also agreed to pay the costs associated with the bankruptcy case and to indemnify the investors for any damages they might incur.

Nine of the investors filed an involuntary bankruptcy petition against HCRE.[31] The involuntary petition asserted that the petitioning creditors held claims against HCRE.   Although it was the funds, not HCRE, that held the assets (ownership interests in the SPEs), the apparent basis for the claims asserted against HCRE was that, as manager, HCRE owed duties to the investors.   The petitioning creditors claimed that by failing to send reports, provide tax information, and make distributions, HCRE had breached those duties.[32]

The point of the involuntary petition had nothing to do with recovering on those debts out of the HCRE bankruptcy estate.   Summit Healthcare (which orchestrated the plan to file the involuntary petition) was well aware that HCRE had little or nothing by way of assets from which the petitioning creditors could recover.[33]

---

[30] Jan. 9, 2023 Hr'g Tr. at 212-213.

[31] D.I. 1.  The petitioning creditors are the Richard and Darlene Peters Trust; the Leroy J. Blake and Linda J. Blake Family Trust; the Roxie M. Bybee Trust; the James D. Franklin Trust; the John Thomas Baikie Revocable Trust; John Jacob Speckmann; Arnold Goldenbaum; Mark Saulic; and Bryan Taylor.

[32] Main Case D.I. 1 at 11 (describing claims as ones for an accounting and breach of contract).

[33] Jan. 9, 2023 Hr'g Tr. at 141-142.

Indeed, Eikanas acknowledged at the evidentiary hearing that the reason for the bankruptcy filing was to invoke a clause in the funds' operating agreements that would permit the investors to replace the debtor as manager of the funds upon the entry of an order for relief in a chapter 7 bankruptcy. Summit Healthcare would thereafter replace HCRE as manager and close out the funds.[34] "Our goal was to try and facilitate getting them out of the situation and really, you know, getting their investment back so they can move on with their lives."[35]

The bankruptcy petition, which was filed on September 16, 2015, was originally served on HCRE's prior address and on its registered agent. While this Court found in connection with an earlier hearing that service was technically proper,[36] the record suggests that the summons was *actually* received by HCRE on September 28, 2015.[37]

The debtor's general counsel, Nuutinen, apparently believed that the summons with which he was served was only an invoice.[38] When Nuutinen ascertained that it was actually a summons, he nevertheless failed to take prompt action, believing (without any stated basis) that he had 21 days from the time he received it to respond.[39] Nuutinen therefore failed to focus on the summons until approximately

---

[34] *See* Defs. Ex. 3 § 7.2 (including definitions of "Dissolution Event" and "Event of Insolvency"); Defs. Ex. 4 § 7.2 (same).

[35] Jan. 9, 2023 Hr'g Tr. at 216. *See also id.* at 214; Defs. Ex. 31, at Exhibit A-1.

[36] Jan. 6, 2016 Hr'g Tr. at 125.

[37] D.I. 202-3 at 98.

[38] *Id.* at 99.

[39] *Id.*

October 9 or 10.[40]  By then, however, it was too late, as the Court had entered the order for relief on October 6.[41]

On October 23, 2015, the debtor moved, under Rule 60(b), to vacate the order for relief.[42]  The Court held an evidentiary hearing on that motion.  Judge Carey was unimpressed by the general counsel's explanation for why he failed to act promptly upon receiving the summons.  "I think his failure to act or to act without alacrity here exhibits, based on this record, a virtual indifference to the existence of a deadline. And frankly, I think it's tantamount to willfulness."[43]  The Court nevertheless was persuaded that the debtor should have the opportunity to contest the petition and directed the parties to settle an order vacating the order for relief.[44]

By that point, however, the petitioning creditors (having terminated the debtor's management rights of the funds) had gotten what they wanted out of the bankruptcy process (their interests in the funds having been purchased by Summit Healthcare) and moved to dismiss the case.[45]  In response to that motion, the debtor asserted that it objected to the dismissal of the case.  It did not, however, suggest that there was a business to be reorganized such that the case should be converted to chapter 11.  Nor did either the debtor or the chapter 7 trustee argue that there were

---

[40] *Id.* at 101.

[41] Main Case D.I. 7.

[42] Main Case D.I. 10.

[43] Jan. 6, 2016 Hr'g Tr. at 150.

[44] *Id.* at 155.

[45] Main Case D.I. 39.

valuable estate causes of action that ought to be pursued by the trustee.[46]   In substance, the debtor sought only to have the Court reserve jurisdiction to consider a motion seeking damages against the petitioning creditors under § 303(i).

After the Court entered an order dismissing the case but reserving jurisdiction over any § 303(i) motion, the debtor brought this motion seeking damages under that section.[47]   At the same time, the debtor also filed an adversary proceeding seeking damages for violation of the automatic stay.[48]   The bankruptcy court dismissed that adversary proceeding on the ground that it had not reserved jurisdiction for that purpose.[49]   The district court affirmed,[50] but the Third Circuit reversed, holding that as a matter "arising under" § 362 of the Bankruptcy Code, Congress created subject-matter jurisdiction over the action, and it made no difference what jurisdiction the court had purported to "reserve."[51]

On remand, the petitioning creditors asserted various state-law counterclaims against the debtor.[52]   Those claims were within the district court's diversity jurisdiction but, as this Court explained in a prior opinion, are outside the bankruptcy jurisdiction and therefore may not be referred to the bankruptcy court under

---

[46] Main Case D.I. 42.

[47] Main Case D.I. 55.

[48] D.I. 1.

[49] D.I. 30.

[50] *Healthcare Real Estate Partners, LLC v. Summit Healthcare REIT, Inc., et al.*, 2018 WL 4500880, *6 (D. Del. Sept. 19, 2018).

[51] *In re Healthcare Real Estate Partners, LLC*, 941 F.3d 64, 71-73 (3d Cir. 2019).

[52] D.I. 58, 77.

28 U.S.C. § 157(a).[53]  This Court accordingly severed those claims, under Rule 21, from the matters that were properly before it.[54]

In light of the overlapping facts between the § 303(i) motion and the adversary proceeding seeking damages for violation of the automatic stay, the contested matter and the adversary proceeding were consolidated and thus litigated together.  This Court held an evidentiary hearing on these matters over three days in January 2023. This Memorandum Opinion sets forth the Court's findings and conclusions.

## Jurisdiction

Pursuant to 28 U.S.C. § 1334(b), this Court has subject-matter jurisdiction over the § 303(i) motion and the § 362(k) complaint since both claims arise under the Bankruptcy Code.  This proceeding has been referred to this Court under 28 U.S.C. §157(a) and the district court's standing order of reference.[55]

## Analysis

During the January trial, the following issues were before the Court: (1) whether the debtor is entitled to recover attorneys' fees under § 303(i)(1) and – if the filing was made in bad faith – whether the debtor may recover compensatory or punitive damages under § 303(i)(2); and (2) whether the debtor was entitled to damages for violations of the automatic stay on account of the actions taken by the

---

[53] *In re Healthcare Real Estate Partners, LLC*, 639 B.R. 294, 302-309 (Bankr. D. Del. 2022).

[54] *Id.*

[55] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

petitioning creditors and Summit Healthcare to remove the debtor as manager of the funds.

**I.    The debtor is entitled to recover its reasonable attorneys' fees, but (despite the fact that the filing was in bad faith) no other damages, under § 303(i).**

Section 303(i)(1) provides that if "the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment…against the petitioners and in favor of the debtor for…costs [and] a reasonable attorney's fee."[56]  If the court finds that the petitioner "filed the petition in bad faith," § 303(i)(2) authorizes the court also to grant judgment in favor of the debtor for "any damages proximately caused by such filing" and "punitive damages."[57]

Here, the Court dismissed the involuntary chapter 7 petition on April 18, 2016.[58]  While the debtor did not actually contest the dismissal of the case, it said enough about how it did not "affirmatively consent" and reserved the right to seek damages under § 303(i) to satisfy the statutory requirements that the dismissal not be "on consent of all petitioners and the debtor" and that the right to seek damages not have been waived by the debtor.[59]

---

[56] 11 U.S.C. § 303(i)(1).

[57] *Id.* § 303(i)(2).

[58] Main Case D.I. 53.

[59] *See* Main Case D.I. 43 at 1 ("To be clear, HCRE Partners does not consent to the dismissal of the involuntary petition and reserves all of its remedies against the Petitioning Creditors, including seeking an award of attorney's fees, costs, all damages and punitive damages.").

As is clear from the use of the word "may" rather than "shall," the right to recover damages under § 303(i) is discretionary.[60]   In exercising that discretion, *Collier's* explains that most courts consider the "totality of the circumstances," including "(1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the petition."[61]   These factors counsel in favor of awarding damages under § 303(i). For reasons described more fully below, the petition was a dubious one and it was filed for purposes that are outside the appropriate aims of bankruptcy law.  The Court thus concludes that the totality of the circumstances weighs in favor of awarding appropriate damages under § 303(i).

### A.    The debtor is entitled to damages under § 303(i)(1) for costs and reasonable attorneys' fees.

Defendants offer three reasons why, they contend, the debtor should not recover fees under § 303(i).  *First*, they argue that the debtor did not actually pay legal fees out of pocket.  Rather, counsel for the debtor was paid by a party that is financing this litigation.  Because the debtor has not paid legal fees, defendants assert that the debtor is not entitled to recover such fees.  *Second*, defendants argue that because certain of the invoices have been redacted, they lack sufficient detail to

---

[60] *See Higgins v. Vortex Fishing*, 379 F.3d 701, 706 (9th Cir. 2004)*; In re Reid*, 854 F.2d 156, 159 (7th Cir. 1988).  *See also* 2 *Collier on Bankruptcy* ¶ 303.33[1]; *In re Anmuth Holdings LLC*, 600 B.R. 168, 201 (Bankr. E.D.N.Y. 2019) ("Upon a finding of bad faith, an award under § 303(i)(2) is not automatic.  A bankruptcy court has [] discretion." (internal citations omitted)).

[61] 2 *Collier on Bankruptcy* ¶ 303.33[1].

permit the debtor to meet its burden of showing reasonableness. *Third*, defendants argue that any incremental costs associated with the debtor's failure to respond on a timely basis to the involuntary petition are unreasonable and should not be awarded.

1.    Defendants' argument about the fact that the litigation was funded by third-party financing, rather than paid out-of-pocket by the debtor, is unpersuasive. When a federal statute entitles a party to recover attorneys' fees, the actual terms of the agreement between the litigant and its counsel are not controlling. Such a statute "contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney …[,] no more and no less."[62] In *Blanchard*, the fact that the attorney retained had agreed to a contingency fee that, in light of the small amount of damages awarded, would yield a fee that was less than would be objectively "reasonable" did not prevent the plaintiff from recovering an amount that the court found to be "reasonable" compensation. Similarly, "where there are lawyers or organizations that will take a plaintiff's case without compensation, that fact does not bar the award of a reasonable fee."[63] This Court sees no reason why an agreement under which a third party financed the litigation should be treated differently. The debtor is accordingly entitled to recover a reasonable attorney's fee.

2.    The Court does not believe that the redaction of the invoices produced in discovery bars the debtor from meeting its burden of proof in establishing that the fees incurred are reasonable. During discovery, certain of the invoices produced were

---

[62] *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989).

[63] *Id.* at 94.

redacted on the ground that producing the full invoice might otherwise require the debtor to reveal matters protected by work-product privilege. At trial, the debtor then sought to introduce into evidence unredacted versions of the invoices. The defendants objected on the ground that the unredacted versions had not been produced to them. The Court ruled that it would permit the debtor to introduce into evidence the redacted versions that it had produced.[64] The Court reserved judgment on the admissibility of the unredacted versions, where notwithstanding the debtor's legitimate concern about being compelled to waive a privilege, the defendants have a reasonable expectation not to be presented at trial with material that was withheld from them in discovery. In the end, however, the Court concludes that this concern is effectively moot, because the Court is able (with the exception of five invoices) to assess the reasonableness of the fees based on the redacted versions of the invoices that were admitted into evidence.

Based on the Court's review of the invoices, Appendix A to this opinion allocates the fees incurred between work that was related to the involuntary petition itself (recoverable under § 303(i)) and work related to the automatic stay claim (addressed below in Part II).[65] The Court has calculated the fees associated with the

---

[64] While the invoices were produced after the applicable deadline, counsel for the defendants acknowledged that the delay did not cause material prejudice. Jan. 9, 2023 Hr'g Tr. at 54. The Court accordingly ruled that the redacted versions could be admitted. *Id.* at 55.

[65] In Appendix A, the Court has summarized the work described in each of the invoices submitted by debtor's counsel and allocated the amounts reflected on those invoices either to the § 303(i) claim or the automatic stay claim, based on the count to which the work primarily was directed. For invoices showing work that appeared evenly balanced between the two claims, the Court has allocated the fees reflected on the invoice on a 50/50 basis between the claims. As set forth at the end of Appendix A, five invoices were so thoroughly redacted that

involuntary bankruptcy itself to come to $172,101.37. Because (except for the five invoices mentioned above) the redactions do not prevent this Court from understanding the nature of the work done and forming a view about its reasonableness, the Court rejects the defendants' contention that those redactions preclude the debtor from meeting its burden of proof on the reasonableness of the fees it incurred.

3.    Finally, defendants argue that any fees that resulted from the debtor's failure to respond on a timely basis to the involuntary petition are unreasonable. That argument may well be a stronger one than defendants had hoped it to be. In this Court's view, the reason that argument is such a strong one is because the involuntary petitions themselves had such glaring defects that the Court concludes that, had the debtor only responded to the petition on a timely basis, it would have had little trouble having the bankruptcy case promptly dismissed.

For one thing, the petitioning creditors must hold claims that are not "the subject of a bona fide dispute as to liability or amount."[66] The debtor, after all, was only the manager of the funds. There is no suggestion that the debtor had legal title to the investors' money and that it wrongfully refused to pay it to them when it became due. Rather, the petitioning creditors' theory is that HCRE, as manager of the funds, was obligated to distribute to the investors amounts that were paid to the

---

the Court could not discern what work was done or even the amount of fees incurred. Those fees accordingly are not included in the totals set forth herein.

[66] 11 U.S.C. § 303(b)(1).

funds.[67]  Because, once Cornerstone's employees quit and joined Summit Healthcare, the debtor was essentially dysfunctional, it failed to cash the checks it had received or to distribute those amounts to the investors.  Is the manager's failure to distribute the funds' money to the investors a basis for the investors to obtain a money judgment against the manager in the amount owed to those investors by the funds?  Perhaps so.  It is certainly a plausible theory.  But when Congress stated that involuntary petitioners need to hold debts for amounts that are not subject to *bona fide* dispute as to liability or amount, it was saying that involuntary petitions may not be filed by creditors whose right to payment from the debtor is based on a creative or novel legal theory, even if it is a plausible one.

More fundamentally, it is stipulated that the purpose of this bankruptcy was not to maximize the creditors' recoveries out of the debtor's estate, but instead to permit the termination of the debtor's role as manager of the funds.[68]  There is no suggestion that this is a proper use of the bankruptcy process.  The Third Circuit held in *Forever Green* that an involuntary bankruptcy case, just like a voluntary one, can be dismissed on the ground that it was not filed in good faith when the reason for the filing is "antithetical to the basic purposes of bankruptcy."[69]  *Forever Green* articulates a "totality of the circumstances" test for assessing whether a case was filed in good

---

[67] January 10, 2023 Hr'g Tr. at 122-123.

[68] D.I. 191 at 6.

[69] *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015).

faith, and offers a long (and non-exclusive) list of considerations that a court may apply.[70]  This case, under that standard, is not a difficult one.

It should not be controversial to say that an involuntary bankruptcy case that is filed by creditors for reasons that have nothing at all to do with maximizing creditors' recovery out of the debtor's bankruptcy estate is not filed in good faith.  To be sure, this Court is not aware of any case that articulates that proposition in so many words.  But that is because this Court is unaware of an involuntary case that was filed for a reason unrelated to maximizing creditor recovery.  In any event, it ought to be self-evident that an involuntary bankruptcy case filed by creditors for reasons that have nothing to do with the creditors' recovery out of the bankruptcy estate (recall that the debtor here had no assets) is necessarily one that is "antithetical to the basic purposes of bankruptcy" and thus should be dismissed under *Forever Green*'s "totality of the circumstances" test.

Accordingly, the conclusion is inescapable that had the debtor responded to the petition, it would have had very little trouble obtaining the dismissal of the case, either on the ground that the requirements of § 303(b) were not met or on the ground that the case was not filed in good faith.  Either way, the time associated with seeking the vacatur of the entry of the order for relief would not have been necessary and the total fees would have been well less than the $172,107.37 actually incurred.

The question, then, is what would it have reasonably cost the debtor to seek dismissal of the bankruptcy case on those grounds?  Debtor's counsel acknowledged

---

[70] *Id.* at 336.

at the hearing that those fees would not exceed $50,000.[71]  The debtor's actual fees

related to challenging the good faith of the bankruptcy filing exceeded that amount.

But because damages under § 303(i)(1) are limited to "a reasonable attorney's fee,"

and any actual fees in excess of that amount are attributable to the debtor's

unreasonable failure to respond timely to the involuntary petition, the Court will

accordingly limit the fees awarded for the work associated with seeking the dismissal

of the case to $50,000.[72]  In addition, had the debtor successfully opposed the petition

and obtained the prompt dismissal of the case, HCRE would be entitled to recover the

fees associated with bringing the § 303(i) motion.  The Court does not believe that the

reasonable fees and costs associated with such a routine motion would exceed

$25,000.   The Court accordingly limits the debtor's aggregate recovery under

§ 303(i)(1) to a total of $75,000.

> **B.   The petitioning creditors filed the involuntary petition in bad faith but the debtor cannot demonstrate any non-speculative compensatory damages; the Court will not award punitive damages under the circumstances.**

The debtor also seeks to recover compensatory and punitive damages under

§ 303(i)(2), which are available "against any petitioner that filed the petition in bad

faith."   The Third Circuit's opinion in *Forever Green* strongly suggests that this

statutory standard for bad faith under § 303(i)(2) is the same "totality-of-the-

---

[71] *See* Jan. 10, 2023 Hr'g Tr. at 78-79.

[72] *See generally In re Houchens*, 85 B.R. 152, 154 (Bankr. N.D. Fla. 1988) (allowing recovery of $50 in attorneys' fees under § 362(k) for a violation of the automatic stay, rather than the substantially greater fees actually incurred, when the court found that "a simple phone call to [the creditor] would have resolved the problem completely" without requiring litigation, and such a call would have required 30 minutes of time, costing $50 in attorneys' fees).

circumstances" test that courts should consider in deciding whether to dismiss a case on the ground that it was filed in bad faith.  Accordingly, for the same reason the Court concluded above that this case would have been promptly dismissed as having been filed in bad faith had the debtor timely responded to the petition, the Court is satisfied that the debtor would be entitled to damages under § 303(i)(2) if it can establish that it suffered a compensable injury.

### 1.    The debtor has not shown any actual damages that were proximately caused by the involuntary petition.

Section 303(i)(2)(A) provides that a court may award "any damages proximately caused" by the filing of the involuntary petition.[73]  The debtor's basic position is that but for the involuntary bankruptcy, the debtor would have become entitled to recover funds, under the terms of the funds' operating agreements, when, among other things, proceeds were generated after a loan was refinanced and one of the underlying properties was sold.  The debtor argues that the amounts it would have earned as manager, but did not because (through the bankruptcy) the petitioning creditors were able to replace it as manager, are damages that it is entitled to recover on the ground that they were proximately caused by the involuntary petition.

Where Congress uses a term, like "proximate cause," with an established common law meaning, courts presume that Congress intended for the word to carry

---

[73] 11 U.S.C. § 303(i)(2)(A).  *See In re John Richards Homes Bldg. Co., LLC*, 439 F.3d 248, 254 (6th Cir. 2006).  *See also* 2 *Collier on Bankruptcy* ¶ 303.33[5].

that meaning.[74] And the Supreme Court has explained that it is the term's general meaning at common law (often as reflected in the Restatement), rather than the common law of any particular state, that Congress is presumed to have adopted.[75]

The Supreme Court has further noted that the term "proximate cause," is a legal "shorthand" for the principle that injuries "have countless causes, and not all should give rise to legal liability."[76] Otherwise put, the term "proximate cause" reflects the intuition that at times, the connection between a party's wrongful conduct and the plaintiff's injury is simply too attenuated for it to make sense to hold the wrongdoer responsible.[77] To similar effect, the Third Circuit explained in *National Medical Imaging* that, in the context of § 303(i)(2), the term "proximate cause" requires that the involuntary bankruptcy be "a substantial factor in bringing about the plaintiff's harm."[78] There, the court found that the fact that the debtor "was on the brink of failure when the involuntary petition was filed" meant that the involuntary bankruptcy was not the proximate cause of the business' losses.[79]

This same principle is reflected in the Restatement, which states that when "an actor's negligent conduct constitutes only a trivial contribution" to the harm, the

---

[74] *Field v. Mans*, 516 U.S. 59, 69-70 (1995); *In re National Med. Imaging, LLC*, 818 Fed. App'x 129, 135 (3d Cir. 2020).

[75] *Field*, 516 U.S. at 70 n.9.

[76] *CSX Transp. Inc. v. McBride*, 564 U.S. 685, 692 (2011).

[77] *See id.* (citing *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 103 (1928)).

[78] *In re National Med. Imaging*, 818 Fed. App'x at 135 (internal quotation omitted).

[79] *Id.*

harm "is not within the scope of the actor's liability."[80]    The Restatement explains that when an actor's negligence, while part of a set of events that caused harm, "pales by comparison to the other contributions to that causal set," the actor will not be found liable for that harm.    Taken together, these authorities stand for the commonsense proposition that when an involuntary bankruptcy petition is filed against an entity that is, for all intents and purposes, defunct, the involuntary petition – even if filed in bad faith – cannot be the proximate cause of the debtor's losses.

The record makes abundantly clear that HCRE was defunct by the time the involuntary petition was filed.[81]    The debtor's general counsel (Nuutinen) testified that the funds' investors were informed of delays caused by "unexpected personnel changes" in August 2014.[82]    As described above, the Cornerstone employees who had the expertise to do the work necessary to manage the funds resigned on account of Cornerstone's failure to pay them and joined Summit Healthcare.    The debtor had none of its own employees and was wholly reliant on Cornerstone Ventures to provide the personnel necessary to carry out its role as manager.    Without access to the necessary personnel, the debtor was paralyzed, unable to provide investors with

---

[80] *Restatement (Third) of Torts* § 36.  The Restatement generally avoids the use of the term "proximate cause," explaining that it uses the term "scope of liability" because it "more accurately describes" the circumstances in which the law "does not impose liability on an actor for all harm factually caused by the actor's tortious conduct."  *See id.*, Special Note on Proximate Cause.

[81] Jan. 10, 2023 Hr'g Tr. at 25-26.

[82] Defs. Ex. 13.  *See* D.I. 202-4 at 68.

necessary tax forms, make distributions, or otherwise fulfill its obligations as manager.

Despite promises to provide monthly updates, HCRE sent the funds' investors a letter, dated October 2014, explaining that the funds had also suffered a decline in revenues from the real estate facilities.[83]   Five days after sending that letter to the funds' investors, HCRE began to receive checks from Summit Healthcare for monies that HCRE was supposed to remit to investors.[84]   By December 2014, HCRE had received approximately $15,000 of cash disbursements from Summit Healthcare.[85] But HCRE did nothing with those checks.   Nuutinen testified that he failed to cash the checks because he had trouble accessing the accounts previously controlled by Eikanas.[86]   In addition to failing to cash the checks, HCRE failed to provide the investors with any further information.   In response to the investors' increasingly urgent demands on HCRE, the trial record makes clear that they heard nothing but crickets.[87]

Even after HCRE eventually managed to open bank accounts, Nuutinen acknowledged that the debtor still could not fulfill its managerial duties.[88]   "We never had the monies to do so."[89]   In sum, the record evidence admitted at trial simply does

---

[83] Defs. Exs. 5-12, 47.  *See also* Jan. 9, 2023 Hr'g Tr. at 170.

[84] Defs. Ex. 7.  *See also* Jan. 9, 2023 Hr'g Tr. at 194.

[85] Defs. Ex. 7.

[86] D.I. 202-4 at 46-47, 64, 68, 75.  *See* Defs. Ex. 7.

[87] D.I. 202-4 at 64-65, 68-81; D.I. 95 at 39.  *See also* Jan. 9, 2023 Hr'g Tr. at 214.

[88] D.I. 202-4 at 77.

[89] *Id.*

not support the debtor's contention that it would have fulfilled its managerial duties but for the involuntary petition.  Instead, the evidence shows that HCRE was essentially dysfunctional and defunct.  It was an entity that was unable to serve the role of manager of the funds.

The problem with the involuntary bankruptcy case was not that it led to the termination of HCRE's role as manager of the funds.  In view of HCRE's inability to serve that role, terminating it was the right thing to do.  The problem was that doing so by means of the involuntary bankruptcy case was improper and intended to serve as a shortcut around the perhaps more burdensome and expensive process of bringing an appropriate proceeding to wind down the funds in the Court of Chancery.  But in either case, the end result would have been the same.

It is true that winding down the funds under state law might have been a cumbersome process.  The investors lacked the ability to do so under the terms of the operating agreements themselves.[90]  As members of the limited liability companies, however, the investors could have pursued "the entry of a decree of judicial dissolution" in Delaware's court of equity.[91]  "The Court of Chancery may decree dissolution of an LLC under [6 *Del. C.*] § 18-802 'whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement.'"[92]

---

[90] Defs. Ex. 3 § 9.2; Defs. Ex. 4 § 9.2.

[91] Defs. Ex. 3 § 13.1.3; Defs. Ex. 4 § 13.1.3.

[92] *In re Seneca Inv., LLC*, 970 A.2d 259, 262 (Del. Ch. 2008) (quoting 6 *Del. C.* § 18-802).

"[J]udicial dissolution is a limited remedy that [the Court of Chancery] grants sparingly."[93]  This remedy is typically limited to "situations where there [is] 'deadlock' that prevent[s] the corporation from operating and where the defined purpose of the entity was fulfilled or impossible to carry out."[94]  "Deadlock refers to the inability to make decisions and take action."[95]

Even so, the record before this Court with respect to the complete dysfunction of the debtor makes clear that had the investors not filed the involuntary petition in this Court in September 2015, they could have instead obtained decrees of judicial dissolution with respect to the funds from the Court of Chancery under § 18-802(a) of Delaware's Limited Liability Company Act.  Indeed, counsel for the debtor acknowledged as much during closing argument:  In urging a finding that the case was filed in bad faith, counsel pointed out that the Court should consider "the panoply of options available" to the petitioning creditors.  "Obviously, they could have gone to state court, to the Delaware Chancery Court….  They could have taken different actions in that space."[96]  While the debtor is correct that the availability of these options suggests that the involuntary case was filed only as a shortcut, and thus counsels in favor of a finding of bad faith, the availability of those alternative ways to get the same economic result cuts strongly against the debtor's claim for damages under § 303(i)(2)(A).

---

[93] *In re Arrow Inv. Adv., LLC*, 2009 WL 1101682, at *2 (Del. Ch. Apr. 23, 2009).

[94] *Seneca*, 970 A.2d at 263.

[95] *Meyer Natural Foods LLC v. Duff*, 2015 WL 3746283, at *3 (Del. Ch. June 4, 2015).

[96] Jan. 10, 2023 Hr'g Tr. at 112.

Because, had the petitioning creditors instead brought a dissolution proceeding against the funds in September 2015, the claims for alleged lost profits that make up the bulk of the debtor's alleged damages in this action would not yet have been ripe. There is accordingly no reason to believe that any value would have been distributed to the debtor in its capacity of creditor of the funds' under § 18-804(a)(1) of Delaware's Limited Liability Company Act or any non-speculative basis in the record from which to conclude that the debtor would have been entitled to recover management fees. Indeed, in view of the debtor's failure to respond on a timely basis to the involuntary bankruptcy filing and overall dysfunction, there is no basis from which to conclude that it even would have asserted such a claim in the Chancery Court.

That is why the debtor's central contention – that serving as manager of the funds is a simple matter and that, had the involuntary bankruptcy not been filed, the debtor would have become entitled to substantial fees as amounts were paid to the funds – fails as a factual matter. The alternative to an involuntary bankruptcy was not that the debtor would continue to exist as a defunct entity and become entitled to fees. The logical inference from the record is that the alternative is that the funds would have been wound down as a matter of state law, and the debtor would have recovered nothing as a result. The debtor's contrary argument about how it would have become entitled to fees is too speculative to be the basis for an award of damages. For that reason, the debtor has not and cannot show that it is entitled to compensatory damages under § 303(i)(2)(A) of the Bankruptcy Code.

For these reasons, the Court comes to the same conclusion that the Third Circuit did in *National Medical Imaging*, another damages action under § 303(i) brought by a debtor that was effectively defunct by the time petitioning creditors filed an involuntary bankruptcy petition against it. "Because the involuntary bankruptcy petition was filed when [the debtor] was already in irreversible decline – by all appearances on the precipice of complete collapse – the petition was not the proximate cause of the business's failure."[97]    HCRE was, without question, in "irreversible decline."    The debtor had no assets, was wholly dysfunctional, and was entirely incapable of serving as the funds' manager.    The Court accordingly finds, as a matter of fact based on the record evidence before it, that the filing of the involuntary petition did not proximately cause the debtor's losses.    The debtor therefore is not entitled to recover compensatory damages under § 303(i)(2)(A).

### 2. The Court will not award punitive damages in the unusual circumstances of this case.

In addition to compensatory damages, § 303(i)(2)(B) expressly authorizes a court to award punitive damages to a debtor against which an involuntary petition is filed in bad faith.    The law is clear that an award of punitive damages is discretionary.[98]    The purpose of punitive damages is to punish the wrongdoer and to deter (both specifically and generally) future wrongful conduct.    In addition, in order

---

[97] *In re National Med. Imaging*, 818 Fed. App'x at 136.

[98] 2 *Collier on Bankruptcy* ¶ 303.33[6][b].

to comport with principles of due process, punitive damages need to bear some reasonable relationship to the actual damages suffered by the debtor.[99]

In view of the Court's determination that the filing of the involuntary petition did not cause the debtor any compensable injury, there is at least a question whether due process would permit a material punitive damages award.[100]  The Court need not reach that question, however, because even in the absence of the constitutional concerns, the Court concludes that the circumstances of this case do not warrant the imposition of punitive damages.

As this Court reads the caselaw, an award of punitive damages should be reserved for cases of particularly egregious misconduct.  Aggressive litigation behavior or honest mistakes of judgment should not give rise to punitive damages.[101] As described above, the Court thinks it clear enough from first principles that a bankruptcy filing that is unrelated to an effort to maximize creditors' recovery against the bankruptcy estate is improper and not filed in good faith.  For purposes of awarding punitive damages, however, the Court is moved by the fact that there

---

[99] *See Brand Marketing Group LLC v. Intertek Testing Services, N.A.*, 801 F.3d 347, 362 (3d Cir. 2015).

[100] *See CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*, 499 F.3d 184, 192 (3d Cir. 2007) (finding $2 million punitive damages award to violate due process in view of $109,000 compensatory award and observing that "the 18:1 ratio in this case crosses the line into constitutional impropriety").

[101] *See In re National Med. Imaging*, 818 Fed. App'x at 134-135 (the petitioning creditor's "email is certainly suggestive of an aggressive litigation strategy, but, on this record, it does not constitute evidence warranting an award of punitive damages.  Nor does the fact that the District Court dismissed the involuntary bankruptcy as improperly filed mean that [the debtor] is necessarily entitled to punitive damages, even given what was characterized by the District Court as the creditors' 'negligent and hasty approach' to filing the involuntary bankruptcy.").

does not appear to be any case that is factually similar to this one.  In the absence of such precedent, it was not *so* obvious that this filing was in bad faith that the imposition of punitive damages is justified.

It should be emphasized, however, that the Court views this as a close call. The filing of an involuntary bankruptcy petition is not a matter that ought to be undertaken lightly.  An involuntary petition certainly should not be filed simply because going through the dissolution process in the Court of Chancery might have entailed a more expensive or elaborate process.  While the Court has concluded that, in the absence of clear authority, punitive damages should not be awarded here, that conclusion should not detract from the message that the filing of this case was inconsistent with the aims of bankruptcy and therefore in bad faith.

### C.   There is no such thing as a "*de facto*" petitioning creditor.

Section 303(i) contemplates the entry of a judgment for attorneys' fees "against the petitioners and in favor of the debtor."  The petitioners in this case were those creditors who filed the involuntary petition – the investors in the funds.  The debtor, however, asks the Court also to find Summit Healthcare liable on the ground that it orchestrated the filing and should therefore be deemed to be a *de facto* petitioning creditor.

As an initial matter, it is by no means obvious that it matters whether Summit Healthcare is or is not directly liable to the debtor for legal fees.  In the Settlement Agreement, Summit Healthcare agreed to indemnify the petitioning creditors for "any costs, damages and fees" that they might incur "as a result of the Bankruptcy

Proceeding."[102]   So whether or not the debtor can recover the fees from Summit Healthcare directly would not appear to affect its ultimate liability for those fees.

The answer to the question, however, is that Summit Healthcare is not directly liable for those fees.   In support of its theory, the debtor points to the Eleventh Circuit's decision in *In re Rosenberg*.[103]   There, the court found that a loan servicer was a *de facto* petitioning creditor when its agent signed the petition, purportedly on behalf of special purpose entities created to securitize a loan.   "Abundant evidence demonstrates that [the loan servicer], the only entity that signed the petition and caused it to be filed, was the petitioning creditor within the meaning of § 303(i)."[104]

Perhaps the Eleventh Circuit's decision in *Rosenberg* was finding that the corporate veil between the loan servicer and the special purpose entities created to securitize the loans at issue should be pierced, such that the actions of one can be attributed to the other.   If that is what the case holds (and in fairness, this is likely the better reading of the opinion), then it is inapposite here, where there is no suggestion that the petitioning creditors and Summit Healthcare might be subject to veil piercing.   Alternatively, the decision could perhaps be read, as the debtor reads it, to suggest that § 303(i) imposes liability not only on the petitioning creditors, but other entities who were instrumental in causing the petition to be filed.   If that is what *Rosenberg* means, however, the decision is unpersuasive.

---

[102] Pls. Ex. 26 at 3.

[103] 779 F.3d 1254 (11th Cir. 2015).

[104] *Id.* at 1269.

Judge Shannon explained in *Fedders* that Congress, in § 550 of the Bankruptcy Code, articulated which parties will be liable for damages on a fraudulent conveyance theory when a transaction is avoided under §§ 544 or 548.[105]  And that articulation in § 550 of who is liable carries an inference that a court should not invent an implied cause of action for "aiding and abetting" a fraudulent conveyance that would effectively expand § 550 beyond its statutory terms.[106]  The same is true of § 303(i). The statute makes the "petitioner" liable for damages.  The petitioner is the party that signs the petition, not someone who encourages the petitioner to do so or orchestrates the scheme.  The Court accordingly will enter judgment under § 303(i) only against the petitioning creditors, not against Summit Healthcare.

## II.    The petitioning creditors and Summit Healthcare willfully violated the automatic stay, and, therefore, the debtor is entitled to costs and attorneys' fees, but not actual or punitive damages.

In addition to seeking damages under § 303(i), the debtor has also asserted claims against the defendants for alleged violations of the automatic stay.  The debtor's theory is that the defendants' actions, to remove the debtor as manager of the funds, to appoint Summit Healthcare as the manager, and ultimately to dissolve the funds, operated to exercise control over property of the estate in violation of 11 U.S.C. § 362(a)(3).[107]

---

[105] *In re Fedders North America, Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009).

[106] *Id.* at 548-549 ("[T]here is no such thing as liability for aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent transfer as a matter of federal law under the Code.").

[107] D.I. 1 ¶ 38.

The filing of a bankruptcy petition, whether voluntary or involuntary, "automatically 'operates as a stay, applicable to all entities,' of efforts to collect prepetition debts outside the bankruptcy forum, including 'any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.'"[108]  Section 362(k) creates a cause of action, allowing "an individual injured by any willful violation of a stay provided by this section" to "recover actual damages, including costs and attorneys' fees." [109]  In addition, "in appropriate circumstances, [the plaintiff] may recover punitive damages."[110]

### A.    Under Third Circuit caselaw, HCRE, a corporate debtor, is considered an "individual" that may seek damages under § 362(k).

Section 362(k) provides that "an individual injured by any willful violation" of the automatic stay may recover damages.[111]  As a matter of statutory construction, one might think that the use of the term "individual" in § 362(k) was intended to limit the statutory damages remedy to cases filed by flesh-and-blood human debtors, rather than debtors that are corporations, partnerships, or other similar entities. Indeed, the overwhelming majority of courts to have considered the issue have reached that conclusion. [112]

---

[108] *City of Chicago v. Fulton*, 141 S. Ct. 585, 587 (2021) (internal citations to 11 U.S.C. § 362 omitted).

[109] 11 U.S.C. § 362(k)(1).

[110] *Id.*

[111] *Id.*

[112] *In re Chateaugay Corp.*, 920 F.2d 183, 185-186 (2d Cir. 1990); *In re Goodman*, 991 F.2d 613, 619-620 (9th Cir. 1993); *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1549-1553 (11th Cir. 1996); *In re Just Brakes Corp. Sys., Inc.*, 108 F.3d 881 (8th Cir. 1997); *In re Spookyworld, Inc.*, 346 F.3d 1, 7 (1st Cir. 2003); *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533,

The Third Circuit, however, has rejected that reading.  In *Atlantic Business and Community Corporation*, the court stated – in the one sentence addressed to the issue – that "[a]lthough Section 362[k] refers to an individual, the section has been uniformly held to be applicable to a corporate debtor."[113]  The case cites to one opinion as authority for that proposition – the Fourth Circuit's decision in *Budget Service*.[114]  In that case, the Fourth Circuit reasoned that the Bankruptcy Code does not define the term "individual," and that it "seems unlikely that Congress meant to give a remedy only to individual debtors against those who willfully violate the automatic stay."[115]

It does not appear that any other appellate court has adopted this position in the more than 30 years since *Atlantic Business*.  The contrary position was well articulated by Judge Boudin in an opinion for the First Circuit, where the court pointed to several other provisions of the Bankruptcy Code that, the court said, suggest the term "individual" was used to distinguish natural persons from corporations and partnerships.

It also bears note that in a recent opinion, albeit an unpublished one, a Third Circuit panel found that the term "individual," when used in a separate provision of

---

536 (5th Cir. 2009); *In re Rafter Seven Ranches L.P.*, 414 B.R. 722, 732-733 (B.A.P. 10th Cir. 2009); *In re C.W. Min. Co.*, 477 B.R. 176, 183 (B.A.P. 10th Cir. 2012).

[113] *In re Atlantic Bus. & Cmty. Corp.*, 901 F.2d 325, 329 (3d Cir. 1990).  The bracket in the quotation above replaces the "h" used in *Atlantic Business* with "k", to reflect the fact that the language now codified as § 362(k) of the Bankruptcy Code was then codified as § 362(h).

[114] *See Budget Service Co. v. Better Homes of Va.*, 804 F.2d 289 (4th Cir. 1986).

[115] *Id.* at 292.

the Bankruptcy Code, 11 U.S.C. § 523(a), intended to distinguish natural persons from corporate entities.[116]  The specific question related to debt that was alleged to be nondischargeable because it fell within one of the categories set forth in § 523(a), such as debt obtained by fraud or debt for willful or malicious injury.[117]  Section 523, however, states that a bankruptcy discharge "does not discharge an individual debtor" from a debt that falls within one of the specified categories.[118]  The Third Circuit in *Boyle*, without mentioning *Atlantic Business*, found this provision inapplicable to a corporate debtor.  "The exception does not apply.  By its terms, this exception applies to 'individual debtors.'  [The plaintiff], however, is a corporate debtor."[119]

Needless to say, whether *Atlantic Business* has been rejected by other courts of appeals or is in tension with later Third Circuit authority is, for the purposes of the task of this Court, neither here nor there.  The decision in *Atlantic Business* is controlling authority on the question presented here, and this Court is duty-bound to apply that precedent.  Accordingly, the debtor here is entitled to seek damages under § 362(k).

---

[116] *Boyle v. PMA Med. Specialists, LLC*, 754 Fed. App'x 93, 96 (3d Cir. 2019) (quoting 11 U.S.C. § 523(a)(6)).

[117] *See* 11 U.S.C. § 523(a)(2) & (a)(6).

[118] 11 U.S.C. § 523(a).

[119] *Boyle*, 754 Fed. App'x at 96.

### B.   HCRE's rights to serve as manager of the funds was property of its bankruptcy estate; the defendants' actions to terminate that right violated the automatic stay.

Once the petitioning creditors filed the involuntary chapter 7 petition, "all legal or equitable interests of the debtor" became property of the estate pursuant to § 541(a) of the Bankruptcy Code.[120]  The term "property of the estate" is defined broadly and includes "all kinds of property, including tangible or intangible property," like contractual rights.[121]  HCRE's right to serve as manager of the funds, a contractual right under the operating agreements from which HCRE derived at least the possibility of being paid fees, was therefore "estate property" within the meaning of § 541.

As such, that right was protected by the automatic stay.  Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[122]  Accordingly, at least at first blush, it would appear that the actions that the petitioning creditors and Summit Healthcare took to remove the debtor as the manager of the funds operated to thwart the debtor's exercise of its contractual rights, and thus violated the automatic stay.

---

[120] 11 U.S.C. § 541(a)(1).

[121] *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001) (citing § 541(a)'s legislative history and *Whiting Pools*); *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983); *see also Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260-261 (3d Cir. 2001).

[122] 11 U.S.C. § 362(a)(3).

The defendants' principal response to that argument is to contend that under the terms of the operating agreements, this Court's entry of the order for relief in the bankruptcy case, rather than any action on their part, operated automatically to terminate the debtor's right to serve as manager.[123]  The operating agreements state that the manager of the funds "shall hold office until such manager withdraws or resigns (or suffers another Dissolution Event)."[124]  A "Dissolution Event," is defined to include an "Event of Insolvency."[125]  And an "Event of Insolvency," in turn, is defined to include "when an order for relief against the Manager is entered under Chapter 7 of the federal bankruptcy law."[126]

The defendants' argument is therefore that, because the termination of the debtor's role of manager occurred automatically under the terms of the documents, none of the defendants' subsequent actions interfered with any property of the estate. Therefore, defendants contend, none of their actions violated the automatic stay.

The debtor's response to that contention is to argue that to the extent the operating agreements would terminate its role as manager upon the entry of an order for relief, such a provision is an *ipso facto* clause that cannot be enforced in bankruptcy in view of § 541(c).  Section 541(c) states that the debtor's property "becomes property of the estate … notwithstanding any provision in an agreement …

---

[123] *See* Main Case D.I. 7.

[124] Defs. Ex. 3 § 7.2; Defs. Ex. 4 § 7.2.

[125] *Id.* at Ex. A, definition of "Dissolution Event."

[126] *Id.*, definition of "Event of Insolvency."

that is conditioned on the insolvency or financial condition of the debtor."[127]  The point of this provision is to prevent parties from "contracting around" bankruptcy.  It does so by invalidating a contractual provision in which a party's rights are affected by the bankruptcy filing or the debtor's financial condition.[128]  And if the applicable provisions of the operating agreements that would have terminated the debtor's rights upon the bankruptcy filing are unenforceable under § 541(c), then the defendants' actions to replace the debtor with Summit Healthcare as manager of the funds would in fact violate the automatic stay.

The defendants' response to this argument is to point to case law that distinguishes, with respect to the enforcement of *ipso facto* clauses, between "governance" rights and "economic" rights.  A right to participate in governance, the defendants contend, is not the kind of property interest protected by the automatic stay.[129]  Because the debtor was the manager but not a member of the funds, the defendants contend it lacked an economic interest and thus the *ipso facto* clause was fully enforceable.[130]

That contention is unsuccessful.  The principal case on which defendants rely for this proposition is addressed to a different section of the Bankruptcy Code – § 365(e) – which addresses the enforceability of *ipso facto* clauses in executory

---

[127] 11 U.S.C. § 541(c)(1)(B).

[128] *See generally* 5 *Collier on Bankruptcy* ¶ 541.26 (16th ed. 2022); *In re W.R. Grace & Co.*, 475 B.R. 34, 152 (Bankr. D. Del. 2012).

[129] D.I. 102 at 2-5.

[130] D.I. 78 at 35.

contracts. The Delaware Court of Chancery did hold, in *Milford Power*, that an *ipso facto* provision in a Delaware LLC agreement (which it found to be executory) could not be enforced to the extent it would strip a debtor of its economic rights but *could* be enforced insofar as it merely terminated the debtor's right to participate in matters of corporate governance.[131]

But that is a distinction that is applicable only to executory contracts, and defendants agree that the operating agreements here are *not* executory.[132] Much like the prohibition on the enforcement of *ipso facto* clauses in deciding what property comes into the bankruptcy estate under § 541, § 365(e)(1) similarly prohibits a contractual counterparty from terminating an executory contract based on the filing of a bankruptcy case.[133]

But the distinction that then-Vice Chancellor Strine drew in *Milford Power* between economic and governance rights was grounded in a further provision of § 365 – one that has no analog in § 541. Section 365(e)(2) states that the terms of § 365(e)(1) do not apply where "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee … and … such party does not consent."[134] As the *Milford Power* court

---

[131] *Milford Power Company LLC v. PDC Milford Power, LLC*, 866 A.2d 738 (Del. Ch. 2004).

[132] D.I. 78 at 36.

[133] 11 U.S.C. § 365(e)(1) ("Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on … the insolvency or financial condition of the debtor.").

[134] 11 U.S.C. § 365(e)(2).

42

explained, § 365(e) contains a "personal services" exception to the prohibition on the enforcement of *ipso facto* clauses in executory contracts.[135]   The basic point is that where the identity of the party with whom you are contracting is truly critical to the contract, a counterparty *may* terminate the agreement on account of bankruptcy, notwithstanding the otherwise applicable prohibition on the enforcement of *ipso facto* clauses.   While the principle applies even in a chapter 11 case in which the trustee remains the debtor in possession, the concept is that if the identity of the party is an important part of the contract, the counterparty should not be required to accept performance from, or render service to, a bankruptcy trustee who is different from the party with which it entered into a contract.

So in the context of an executory operating agreement, *Milford Power* explains that in "the case of an LP or LLC agreement that makes the debtor-partner or member a key part of the entity's management on a going-forward basis," the other parties to that agreement ought to be able to enforce an *ipso facto* clause and avoid a circumstance in which the manager of the entity is a bankruptcy trustee with whom they would never have chosen to go into business.[136]

To articulate this principle – one about not having a go-forward business relationship with an entity with whom you never would have contracted – is to explain why it has no application outside the context of executory contracts.   The statutory basis for the principle comes from § 365(e)(2) of the Bankruptcy Code, which

---

[135] 866 A.2d at 752.

[136] *Id.*

43

renders § 365(e)(1)'s prohibition on the enforcement of *ipso facto* clauses inapplicable to personal services contracts.

But the defendants themselves insist that the operating agreements here are non-executory.  So the prohibition on the enforcement of *ipso facto* clauses that is applicable to this case comes from § 541(c), not § 365(e)(1).  And while § 541(c) closely mirrors § 365(e)(1), the critical point is that § 541(c) does not have a provision, analogous to § 365(e)(2), that permits the enforcement of *ipso facto* clauses in the context of personal services contracts.

Accordingly, the defendants' insistence that the funds' operating agreements are non-executory defeats their effort to rely on the distinction between economic and managerial rights set forth in *Milford Power* and similar cases.  The result is that the *ipso facto* clause on which the defendants rely cannot be enforced.  The debtor's right to serve as manager of the funds thus came into the bankruptcy estate, by virtue of § 541, upon the filing of the petition.  The defendants' actions, after the entry of the order for relief, to terminate the debtor's role as manager and dissolve the funds therefore sought to exercise control over property of the estate, and thus violated § 362(a)(3) of the Bankruptcy Code.[137]

---

[137] Alternatively, because the debtor is complaining only about the loss of the fees it claims it would have earned as manager, rather than the ability to participate in the governance of the funds, one might well view the debtor's interest in serving as manager to fall, in any event, on the "economic" side of the line that divides "management" rights from "economic" interests.

### C.      The violation of the automatic stay was willful.

Damages are available under § 362(k) only for "willful" violations of the stay. The Third Circuit has made clear, however, that "willfulness" requires only that the defendant intend to take the actions that violated the automatic stay.[138] "It is a willful violation of the automatic stay when a creditor violates the stay with knowledge that the bankruptcy petition has been filed.  Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional."[139]  There is no suggestion that the defendants here did not have knowledge of the actions that were in violation of the stay.  The willfulness requirement is thus satisfied.

### D.      The debtor may recover costs and attorneys' fees; none of the other damages it seeks were caused by the defendants' violation of the automatic stay.

Section 362(k)(1) provides that a plaintiff injured by an automatic stay violation "shall recover actual damages, including costs and attorney's fees, and in appropriate circumstances, may recover punitive damages."[140]  Based on the same review of the redacted invoices admitted into evidence and described in Part I.A of this Memorandum Opinion (and as further set forth in Appendix A), the debtor is entitled to recover $517,732.76 in reasonable fees and costs incurred in connection with its effort to enforce the automatic stay.  While this is undoubtedly a substantial

---

[138] *In re Denby-Peterson*, 941 F.3d 115, 123 (3d Cir. 2019).

[139] *Id.* (quoting *In re Lansdale Family Rests., Inc.*, 977 F.2d 826, 829 (3d Cir. 1992)) (internal quotation marks omitted).

[140] 11 U.S.C. § 362(k).

award, the Court is satisfied that the fees and costs are reasonable in view of the fact that this litigation has included two appeals and several evidentiary hearings in this Court, including the January 2023 hearing.

The debtor, however, has not otherwise established that it suffered compensable damages on account of the stay violation. The reason is essentially the same as set forth in Part I.B.1 of this Memorandum Opinion. The Court finds that the debtor's business was defunct and that it was unable to fulfill the obligations it had as manager of the funds. While the debtor offers speculation about fees that it might have earned had it remained as manager of the funds, the Court is not persuaded that there is any causal relationship between the defendants' actions that violated the automatic stay and the debtor's failure to earn the fees it describes. Because the alternative to replacing the debtor as manager through invocation of the *ipso facto* clause would have been the dissolution of the funds in a dissolution proceeding in Chancery Court, there was no scenario in which the debtor would have earned the fees in question. It therefore did not suffer compensable damages from the acts that violated the automatic stay.

**E.    The Court will not award punitive damages.**

Section 362(k) also allows for punitive damages "in appropriate circumstances." The Third Circuit has explained that bankruptcy courts should consider three factors in determining whether to award punitive damages for violation of the automatic stay: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive

damages awarded…and the civil penalties authorized or imposed in comparable cases."[141]

The Court will not award punitive damages in the circumstances of this case. As described in Part I.B.2, the Court viewed the question whether to award punitive damages under § 303(i)(2) as a close one, since it ought to have been clear enough that the filing of an involuntary petition as a way to remove the debtor as manager of the funds was not a proper use of the bankruptcy process.  But the request for punitive damages for the stay violation is much easier.  Here, although the Court rejected the argument in Part II.B of this Memorandum Opinion, there is case law from which one might have concluded that the actions taken did not violate the automatic stay.  In view of the colorable (although ultimately incorrect) contention that the defendants' actions were permissible, it would be inappropriate to award punitive damages.

## Conclusion

For the foregoing reasons, the Court concludes that the debtor is entitled to an award of $75,000 against the petitioning creditors on its claim under § 303(i) and an award of $517,732.76 against the defendants on its claim for violation of the automatic stay.  The parties should meet and confer and, if possible, settle, under certification of counsel, a form of order to be docketed in the main case and a form of judgment to be docketed in the adversary proceeding.  Should the parties be unable

---

[141] *In re Lansaw*, 853 F.3d 657, 671 (3d Cir. 2017) (quoting *CGB Occupational Therapy, Inc. v. RHA Health Servs.*, 499 F.3d 184, 188-189 (3d Cir. 2007) (internal citations omitted) (awarding punitive damages for emotional distress).

to agree on a form of order and/or judgment, counsel should contact chambers to set

a status conference on how to proceed.

Dated: May 12, 2023

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE